**JIFFY, INCORPORATED, Appellant,**

v.

**JORDAN INDUSTRIES, INC.,**
**Appellee.**

**Patent Appeal No. 8917.**

United States Court of Customs
and Patent Appeals.

Aug. 23, 1973.

Rehearing Denied Oct. 25, 1973.

Arthur H. Seidel, Seidel, Gonda & Goldhammer, Philadelphia, Pa., attorneys of record, for appellant. Edward C. Gonda and Ronald L. Panitch, Philadelphia, Pa., of counsel.

Alan H. Bernstein, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., attorneys of record, for appellee.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Judges, and ALMOND, Senior Judge.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Trademark Trial and Appeal Board, dismissing an opposition to appellee's application to register the

mark JIF–LOK for "fasteners."[1]   The mark as it appears in the application is slightly stylized:

# JIF-LOK

The opposition was based on appellant's prior use and registration[2] of the mark JIFFY for "adhesive cloth picture hanger, adhesive cloth picture eyelet, magnetic key container, magnet, magnetic clip, magnetic hook, metal picture hanger, picture hanging kit, picture frame holder, picture frame pender, screw eyes, picture wire, bottle opener, combination bottle opener and closer, expansion wall fastener, wall hook, closet rod bracket, door stop, shower curtain ring, eyelet with eyeletting tool combination, mirror holder, skeleton key, lid fastener, potato baking nails, lacing pins, bumper set, can holder, leg tips, cup hook, friction catch, can opener, window sash lock, casters, clothesline plates, broom handle tips, chair glides, and soap dish sponge." [3]

The board opinion is reported in full at 167 USPQ 563 (1970). Familiarity with that opinion is assumed.

## Opinion

■   We think that the board gave too much weight to the marks of third parties, to appellee's use of the mark JIF–EZE, and to the suggestive nature of JIFFY. It is undoubtedly true that the suggestive nature of the mark made it what is termed a "weak" mark, at least when the mark was first used. However, under well established law, a weak mark need not remain a weak mark forever. Development of association with the user as a source of the goods through continued sales and ad-

vertising of the goods may turn a "weak" mark into a strong, distinctive trademark.   Clinton Detergent Co. v. Proctor & Gamble Co., 302 F.2d 745, 49 CCPA 1146, 1150–1151, 748 (1962); Roux Laboratories Inc. v. Clairol Inc., 427 F.2d 823, 57 CCPA 1173 (1970); Standard International Corp. v. American Sponge & Chamois Co., 394 F.2d 599, 55 CCPA 1155 (1968).

While the board's opinion did mention the large number of sales by appellant, the nature of appellant's position is made clearer by consideration of the following excerpts from the testimony of its president, Mr. Margulis, on direct examination:

Q401 How many Jiffy picture hangers approximately have you sold since 1950 or 1949?

A I'd say our records of hooks would show in the billions.

Q402 Literally, in the billions?

A Billions, yes.

Q403 Where have they been sold? A They've been sold in the leading chain store syndicates.   When I say syndicates, I mean Five and Dime, such as F. W. Woolworth Company, W. T. Grant, G. C. Murphy, J. J. Newbury, Ben Franklin Stores and the like type, similar to the Five and Ten Cent stores.   In addition to that, we are one of the leading suppliers to ARMI, American Rack Merchandisers Institute, and SMA, which is Service Merchandisers Institute.   They service ninety-five per cent of the leading chain store food markets, such as Food Fair, Acme, A and P, and Piggly Wiggly Stores, and Kroeger Stores.

And each one of these type of supermarkets have a houseware and hardware department, and the majority of them are serviced by rack jobbers.

1.  Application Serial No. 295,147, filed April 8, 1968, alleging first use February 27, 1968.

2.  Registration No. 782,695, issued January 5, 1965, alleging first use July 25, 1950.

3.  The record establishes that appellant also used the mark on locks for telephone dials with no evidence as to when that use began.

In addition to that, a lot of them buy and purchase direct, and we sell them direct too. Plus the fact we sold the leading wholesale hardware companies in the United States, who service retail stores in every State in the United States, including Alaska, including Honolulu, Hawaiian Islands, including Puerto Rico, including very many countries in Europe, such as the Scandinavian countries, England, France, Belgium, Italy, too many numerous foreign countries to mention. South America, Panama, and so on and so forth.

\* \* \* \* \* \*

Q431 \* \* \*

A \* \* \* Now, in addition to that, I did not mention this before. I just touched on the fact of selling Five and Ten Cent Stores, hardware stores, hardware retailers, supermarkets, food chains. We sell art and gift shops. We sell stationery stores. We sell picture frame companies. We sell people that have general stores that want to set up a section for hardware and houseward [sic] products. And this is the purpose of this rack. Some want sixty-items, some want a hundred and twenty items, some want two hundred, three hundred items, and this is how we line these racks up, according to what they want.

Q432 How many accounts do you have, Mr. Margulis?

A We sell the leading drug chains, in addition to art and gift shops and stationery stores, which I had forgotten for the moment. \* \* \*

Q433 By leading drug chains, you mean whom?

A For instance, I'm talking about Cunningham Drugs, I'm talking about People's Drugs, from Washington to the Midwest. I'm talking about Marshall Drugs, I'm talking about Sun Ray Drugs, I'm talking about Thrifty Drugs. There's too many to mention.

Q434 How many accounts does Jiffy Enterprises and Jiffy, Inc., have? How many accounts do you have?

A Well, when you use the word accounts, I'd like to define that very clearly. For instance, you take an account like Woolworth. We classify this as one account, but in reality they have over 3500 stores. In addition to that, they presently have 100 Woolco stores, which are department stores or discount stores. We sell every one of their discount stores. We not only sell them, like, one or two or three items; they take our complete catalogue and they buy on the average of three or four hundred, two hundred, one hundred items that we make; and we sell it to these Woolco Stores direct.

Plus the fact, when I say the Ben Franklin Stores, we call them one account and they are approximately 2500 to 3500 stores.

Q435 How many accounts do you have, considering—

A Wait a minute. You take, for instance, W. T. Grant. They have close to 1000 stores. We call them one account. Take J. J. Newbury, they might have 800 stores. You take G. C. Murphy, well, we call that one account. They might have 1400 stores.

So, an accumulation, I'd venture to say that we sell perpahs [sic] a quarter of a million stores throughout the United States, where we might only have 7500 or 10,000 accounts, which might seem small, 7500, 10,000 accounts. But when you multiply that where one outfit has 2500 stores, another one has 1000 stores, another one has 1500 stores, they figure out to, you know, a couple of hundred thousand stores.

As a matter of fact, a couple of years ago we figures [sic] out that an average of 100,000 packages of Jiffy hangers—of different products, rather —not only the hangers, are sold daily, according to what we ship, 100,000 packages in the various stores.

We indicated and say this very clearly on the second page of our catalogue, our 1968 catalogue. Would you like me to read this, sir?

Q436 Is that based on actual inventory of shipments?

A Shipments.

Q437 About 100,000 packages or products a day going out?

A Of the various products. This was two years ago. Now, since then our sales increased on the average of a quarter of a million to four hundred thousand dollars yearly, or 150,000, and this would tend to prove that there is more than 100,000 various Jiffy packages sold daily.

\* \* \* \* \* \*

Appellee contends that appellant has failed to show any secondary meaning for its mark for a variety of reasons. First, it is pointed out that appellant did not introduce any invoices, sales documents or sales summaries. However, we are of the opinion that the alleged sales figures are adequately established in this record. Mr. Margulis' testimony concerning the number of sales finds corroboration in the catalogue to which he referred, as well as by constant reiteration of the phrase "over one billion sold" in advertising which preceded his testimony by a number of years. While we are aware that statements made in advertising are not always one hundred percent accurate, the manner in which the statement was used in the present case makes it extremely unlikely that Mr. Margulis' testimony was purely "puffing" as appellee contends. We also note that Mr. Margulis' testimony concerning the companies with whom appellant does business is supported by the testimony of the man in charge of appellant's advertising.

Appellee states that "Appellant's testimony is silent as to whether the sales to a quarter million stores were products bearing the Trademark JIFFY or bearing some other trademark." This contention is flatly contradicted by Mr. Margulis' testimony concerning the package for JIFFY expansion wall fasteners:

Q415 Have you used the trademark Jiffy on this product continuously since 1956?

A Yes, sir, we have, without a let-up. As a matter of fact, every one of our packages have the logo Jiffy on them. The logo means the exact slant of the way the word is written, you know what I mean.

Q416 And is that true of every product?

A Every product we have has the word Jiffy on it. Every package we manufacture or we make has the logo, the word Jiffy on it. At the present time we make over 600 different products.

Q417 And each one of them is packaged with the word Jiffy?

A With the word Jiffy on them.
\* \* \*

■ The appellee points to the board's finding that "most of opposer's promotional efforts have been directed to the trade and not to the general public." Appellee also points out that appellant's total advertising budget amounts to only $20,000 to $30,000 per year, and maintains that secondary meaning cannot be established on that basis. We cannot ignore the evidence concerning the manner in which both appellant's and appellee's goods are actually sold. Both place their products on the familiar "bubble cards" which are hung on peg boards and floor racks which are on display in the stores which sell the goods. The mark JIFFY appears prominently on the reproductions of appellant's bubble cards in the record. While appellant may not have allocated the cost of printing such cards as "advertising" costs, the consumer who views such racks is confronted with advertising just as much as if appellant went to the expense of producing separate signs calling attention to its products. The level of appellant's sales testifies to the success of this method of "advertising." The happy circumstance that further

advertising appears unnecessary carries no implication that appellant's mark has not attained distinctiveness.

Appellee states:

Appellant's testimony is also silent as to what *products* were sold. Perhaps the bulk of Appellant's sales are for picture hangers * * * and only an infinitesimal amount are for expansion fasteners. This cannot be determined in view of the utter paucity of the record.

Clearly the least that can be said is that appellant has established substantial consumer response with regard to its picture hangers. Considering the similarities between the marks it is our opinion that the use of JIF-LOK on fasteners would be likely to cause confusion or mistake within the meaning of section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), in view of appellant's established use of JIFFY on its *picture hangers*.

Moreover, had the board not erroneously found that appellant's mark is a weak one, the fact that appellant's prior registration specifically covers "expansion wall fasteners," which is an apt description of appellee's product, should at *least* have given rise to a doubt as to likelihood of confusion. Of course, that doubt would have to be resolved against appellee. Myrurgia, S. A. v. Comptoir De La Parfumerie, S. A. Ancienne Maison Tschanz, 441 F.2d 673, 58 CCPA 1167, 169 USPQ 587 (1971).

For the reasons stated above, the decision of the board is reversed.

Reversed.

MARKEY, C. J., dissents.

RICH, Judge (dissenting).

I would affirm on the unanimous opinion of the board, 167 USPQ 563 (1970). The board considered the voluminous sales under the JIFFY mark which, no doubt, have made it well known. The better known it is, the less likelihood of confusion there would be, in my opinion, assuming concurrent use of JIF-LOK. Compare Lever Brothers Co. v. Producers Chemical Service, 283 F.2d 879, 48 CCPA 744 (1960), and In re General Electric Co., 304 F.2d 688, 49 CCPA 1186 (1962).